**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

     Plaintiff,

v.                                            Case No.

RES-CARE, INC. D/B/A BRIGHTSPRING HEALTH SERVICES
and
ARBOR E&T, LLC D/B/A EQUUS WORKFORCE SOLUTIONS,

     Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

## NATURE OF THE ACTION

EEOC brings this action pursuant to Titles I and V of the Americans with Disabilities Act, as amended, and Title VII of Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act of 1978 and Title I of the Civil Rights Act of 1991 to correct unlawful employment policies and practices and unlawful discrimination on the basis of sex, pregnancy and/or disability and retaliation and to provide appropriate relief to Charging Party, Cheyenne R. Benavidez . This action is against Defendants Res-Care, Inc. d/b/a BrightSpring Health Services and Arbor E&T, LLC d/b/a Equus Workforce Solutions (collectively "Defendants"). As stated with greater particularity below, the Equal Employment Opportunity Commission ("EEOC") alleges that Defendants engaged in unlawful conduct when they discriminated against Benavidez in violation of Title VII in the terms, conditions, or privileges of her employment and

disciplining and discharging her because of her sex (female) and her pregnancy. Further, Defendants discriminated against Benavidez by disciplining and discharging her on the basis of her disabilities, failing to accommodate her by not making reasonable accommodations to her known disabilities and discharging her in retaliation because of her requesting and taking medical leave as a reasonable accommodation for her disability.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to Title VII of Civil Rights Act of 1964 ("Title VII"), Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA"), Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. Section 706(f)(1), (3), 42 U.S.C. §2000e-5(f)(1), (3), and pursuant to Sections 102 and 503 of the Civil Rights Act of 1991, 42 U.S.C. §1981a and 42 U.S.C. § 12203(c).

2.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of New Mexico.

## PARTIES

3.      Plaintiff, the Equal Employment Opportunity Commission, is the agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII, and Title I of the ADA. Further, EEOC is expressly authorized to bring this action by Section 706(f)(1) and (3), 42 U.S.C. § 2000e-5(f)(1), and (3) and Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference 42

U.S.C. § 2000e-5(f)(1) and (3).

4.      Defendant Res-Care, Inc., d/b/a BrightSpring Health Services ("Defendant Res-Care"), is a foreign corporation with its local offices in Hobbs, New Mexico and its headquarters in Louisville, Kentucky. Res-Care owns several divisions and/or subsidiary companies, including Arbor E&T, LLC, d/b/a Equus Workforce Solutions ("Defendant Equus").

5.      Defendant Arbor E&T, L.L.C., d/b/a Equus Workforce Solutions (formerly Res-Care Workforce Services) is foreign limited liability company with its local offices in Hobbs, New Mexico and its headquarters also in Louisville, Kentucky. Equus/ Res-Care Workforce Services, with approximately 3,000 employees nationwide, is a division of parent company Res-Care Inc., d/b/a BrightSpring Health Services.

6.      At all relevant times, Defendants have continuously been employers engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h) and Section 101(5) and 101(7) of the ADA, 42 U.S.C. §§ 12111(5) and (7), which incorporate by reference Sections 701 (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

7.      Defendants had at least fifteen (15) employees on a continual basis at times relevant to this civil action.

8.      At all relevant times, Defendants operated as an integrated enterprise. Evidence of Defendants' operating as an integrated enterprise includes but is not limited to the following:

        a.  Defendant Res-Care, Inc., operates several subsidiary companies,

including Defendant Equus.

b.  Together, Defendants manage career centers, Job Corps Centers, business services operations, and family support functions nationwide, which included the Southwestern New Mexico Workforce Innovation and Opportunity Act ("WIOA") Adult and Dislocated Worker Programs.

c.  Defendants' operations are interrelated. Defendants share a single accounting system for all payroll purposes, have tax records stored in the same location, and jointly use the same Defendant Res-Care employment policies, including a shared Defendant Res-Care employee handbook.

d.  Both Defendants recognized Charging Party Benavidez and her immediate supervisor Patrick Madrid as their employees.

e.  Defendant Res-Care has centralized control of labor relations. These labor relations include payroll, and other human resources functions.

f.  Defendants share certain employees engaged in responsibilities for both Defendants, including human resources and accounting personnel.

9.    At all relevant times, each of the Defendants have been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## GENERAL ALLEGATIONS

### Conditions Precedent

10.     More than thirty days prior to the institution of this lawsuit, Cheyenne R. Benavidez filed a charge of discrimination with the EEOC alleging violations of Title VII and the ADA by Defendants.

11.     The EEOC provided Defendants with notice of the charge of discrimination.

12.     The EEOC investigated the charge of discrimination.

13.     On August 2, 2023, the EEOC issued a letter of determination to Defendants, finding reasonable cause to believe that Defendants engaged in certain unlawful employment practices in violation of Title VII and the ADA.

14.     The EEOC's letter of determination included an invitation for Defendants to join the Commission in informal methods of conference, conciliation, and persuasion, in an attempt to eliminate the alleged unlawful employment practices and seek full relief for Charging Party.

15.     Defendants participated with EEOC and Charging Party in conciliation, during which Defendants and EEOC communicated regarding the alleged unlawful employment practices and how to eliminate and remedy them.

16.   The EEOC and Defendants were unable to reach an agreement acceptable to the Commission through the conciliation process.

17.     On or about September 7, 2023 the EEOC sent notice to the Defendants that conciliation efforts had failed.

18.     The EEOC fulfilled all conditions precedent to the institution of this lawsuit.

***Defendants' Policies and Practices***

19.     At all relevant times, Defendants instituted and/or maintained leave policies or practices which allowed employees to take approved leave for any reason under their Planned Time Off ("PTO") policies, as long as the employee had accrued or saved enough leave to cover the employee's requested absences.

20.     As required by the Family Medical Leave Act ("FMLA"), Defendants' policies provided up to 12 weeks of unpaid leave for employees with at least one year of employment.

21.     For employees who were ineligible for FMLA leave, either due to being employed less than one year or having used their maximum 12 weeks of leave for that particular year, Defendants only allowed employees to take additional leave for medical emergencies and/or illnesses if they had sufficient leave accumulated in their PTO account.

22.     Under Defendants' leave policies, if an employee took leave but did not have enough PTO leave time to cover the absence in their leave bank, the employee's absence would be considered "unapproved" or "unexcused."

23.     Pursuant to Defendants' Policy 7.2, "Authorized absences are defined by Defendants (and applicable state/provincial laws [for Canada operations] and labor union contracts) policies for Planned Time Off (PTO), holidays, Emergency Leave Reserve (ELR), funeral leave, jury duty, voting time, relocation, military leave, general leave of

absence, family medical leave, short-term disabilities, worker's compensation, and accommodations per the Americans with Disabilities Act. Time off from work is unpaid unless the Company has established a specific policy providing pay for time off and an employee meets those policy or benefit requirements."

24.     Defendants' Policy 7.2 defines **Excessive Absenteeism** "as an unauthorized absence (when an employee misses more than half of his/her scheduled work shift) or a pattern of  absences (such as calling in sick on multiple Fridays/Mondays or days before or after a holiday or planned time off) that interferes with the operation's ability to provide quality service. Excessive absenteeism is subject to progressive corrective action, up to and including termination.

25.     Defendants' Policy 7.2 states: "The Company has and will continue to give consideration to any and all reasons which employees submit to justify their absences/ tardies. Any employee who is absent/tardy without a justifiable reason (see Section B) will be subject to progressive correction action in accordance with the following procedure: 3 unexcused absences = Progressive Corrective Action Step."

26.     Defendants' Policy 7.2 also states: "Multiple days of continuous absences will be counted as a single occurrence provided that the proper call-in procedure was followed by the employee."

27.     Defendants' employees who accumulated unapproved or unexcused absences under the leave policies could be disciplined by the company, ranging from a written warning to termination of their employment.

28.     Prior to disciplining employees for their use of leave for medical reasons in

excess of their PTO leave balances, Defendants did not engage with the employees in an interactive process to explore or consider potential reasonable accommodations for their employees under the ADA, including affording an employee with a disability with unpaid leave or flexibility in complying with Defendants' attendance and leave policies.

29.    Defendants' COVID policy was explained verbally by supervisor Patrick Madrid to his subordinate employee Cheyenne R. Benavidez when she was diagnosed with COVID in December 2020.

30.    Defendants' supervisor Patrick Madrid stated to Cheyenne R. Benavidez that the company policy was to place an employee who had been diagnosed with COVID on leave for fourteen (14) days.

### *Charging Party Cheyenne R. Benavidez*

31.    Charging Party Cheyenne R. Benavidez ("Benavidez") was hired by Defendants on December 26, 2018 to work as a Talent Development Specialist in Socorro, New Mexico.

32.    As a Talent Development Specialist, Benavidez's duties included recruitment and job placement of workers mainly in the southwest portion of New Mexico.

33.    Benavidez was a qualified employee with several disabilities, including asthma (affecting her respiratory system), diabetes (affecting her endocrine system) and heart problems (affecting her cardiovascular system), including previous heart and arterial surgeries.

34.    Benavidez' disabilities substantially limited her in several major life

activities including, without limitation, breathing, inability to control her blood sugar and the restricted flow of blood within her arterial system.

35.    On January 16, 2020, Benavidez learned she was pregnant.

36.    Due to her pre-existing disabilities, Benavidez's treating physicians diagnosed and treated her as having a high-risk pregnancy.

37.    Benavidez's treating physicians explained that her pregnancy caused additional stress to her body and that if any of her medical impairments flared up, it could result in death to her or her fetus.

38.    During her pregnancy, Benavidez developed a pregnancy-related medical impairment known as *de Quervain's* tendinopathy which affected the nerves in her hand.

40. The nerve pregnancy-related impairment was diagnosed in laymen terms  as "Mother's Thumb" which affected her musculoskeletal system and her major life activity of restricted grasping, gripping and lifting with the hand. The disease required her to be seen and treated by a hand specialist.

41.    On January 16, 2020, Benavidez informed her immediate supervisor, Patrick Madrid, and second-line supervisor, Yvette Bayless, she was pregnant.

42.    On January 17, 2020, Benavidez was called to a disciplinary counseling session with supervisors Madrid and Bayless about future expectations of her in the workplace.

43.    On February 19, 2020, Defendants' Human Resources department sent FMLA paperwork to Benavidez because of her pregnancy.

44.    In March 2020, Benavidez informed her supervisors Madrid and Bayless that her doctors were treating her as having a high-risk pregnancy due to her pre-existing disabilities.

45.    During her employment, Benavidez states the following dates were absences due to her pregnancy: January 16, 2020, January 28, 2020, March 2, 2020, March 27, 2020, April 15, 2020, April 27, 2020, May 12, 2020, May 22, 2020, June 26, 2020, June 30, 2020, July 24, 2020, July 28, 2020, July 31, 2020, August 4, 2020, August 7, 2020, August 11, 2020-October 16, 2020, and February 26, 2021.

46.    Benavidez states the leave dates, listed in paragraph 45 above, were absences due to her pregnancy and were excused or approved by her immediate supervisor, Patrick Madrid.

47.    The leave Benavidez used, listed in paragraph 45 above, was determined necessary by her doctors for the treatment of her high-risk pregnancy and/or post-delivery recovery and/or pregnancy-related hand impairment, aside from the maternity leave she took from September 5 through October 16, 2020.

48.    Prior to August 11, 2020, Benavidez had applied for and been approved for FMLA leave to begin before the birth of her child through November 27, 2020.

49.    During her August 11, 2020 appointment with her OB/GYN in Socorro, Benavidez was sent via air ambulance to Presbyterian Hospital in Albuquerque, New Mexico because of emergency medical issues with her pregnancy.

50.    On August 12, 2020, the physicians treating her in Albuquerque wrote a letter placing Benavidez on medical leave due to her high-risk pregnancy.

51.     On August 12, 2020, Benavidez notified Defendants that her doctors had placed her on emergency medical leave due to her high-risk pregnancy.

52.     Supervisors Madrid and Bayless informed Benavidez that her August 12 absence would be unexcused (as defined by Defendants' policies) because she did not have leave time available in her PTO account.

53.     Defendants placed Benavidez on FMLA leave for her high-risk pregnancy and maternity leave on August 13, 2020.

54.     Benavidez delivered her baby on September 5, 2020.

55.     Defendants disciplined and later fired Benavidez because of alleged excessive absences, including emergency medical leave on August 12, 2020.

56.     Defendants told Benavidez she was being disciplined for missing work on August 12, 2020 because she was out of leave in her PTO bank.

57.     While she was on FMLA medical and maternity leave, Benavidez received numerous calls from her supervisor Madrid, repeatedly asking her when she was coming back to work.

58.     Because of the pressure Benavidez's supervisor imposed on her to return to work, Benavidez returned to work early from her maternity leave on October 16, 2020.

59.     On November 17, 2020, Defendants issued a written discipline to Charging Party for her use of leave in violation of Defendants' leave policies. The written discipline was given to her during a meeting with her immediate supervisor, Patrick Madrid, and her second-line supervisor, Yvette Bayless.

60.    During the meeting and listed in the November 17, 2020 written discipline document, Benavidez's supervisors emphasized that she had taken a lot of leave and missed a lot of work due to her past pregnancy and maternity related issues.

61.    The primary purpose of the meeting on November 17, 2020 was to make sure Benavidez did not take any additional leave unless she accumulated the required PTO leave in accord with Defendants' policies. Otherwise, according to her supervisors, her leave would be treated as "unexcused" (as defined by Defendants' policies), and she would be subject to further discipline.

62.    On December 7, 2020, Benavidez became ill with COVID. Benavidez contacted her immediate supervisor, Madrid, and let him know she was taking leave that day because she was running a fever and vomiting.

63.    Supervisor Madrid approved Benavidez's absence for December 7, 2020 as an excused absence due to COVID.

64.    On December 8, 2020, Benavidez received information that she had tested positive for COVID. She immediately communicated this information to her supervisor Patrick Madrid.

65.    On December 8, 2020, supervisor Madrid told Benavidez that this day was also an excused absence due to her having COVID.

66.    Because of her pre-existing disabilities (bradycardia. diabetes and asthma) Benavidez was at high risk for further COVID complications.

67.    Defendants, pursuant to their COVID polices, placed Benavidez on medically excused leave from December 10, 2020 through December 21, 2020.

68.     Subsequent to her returning from the COVID leave of absence, Benavidez was disciplined for taking medical leave on December 7, 2020 and December 8, 2020, the days she first became ill and was diagnosed with COVID.

69.     Pursuant to Defendants' Policy 7.2, the multiple days of continuous absences by Benavidez for COVID should have been counted as a single occurrence; the continuous absences being December 7, 2020 through December 21, 2020.

70.     The reason given to Benavidez for the discipline and discharge for taking medical leave on December 7, 2020 and December 8, 2020 was because she did not have sufficient PTO leave available to take off work.

71.     On February 10, 2021, Madrid and Bayless met with Benavidez and gave her a final written warning about her use of leave. During that meeting, Madrid and Bayless advised Benavidez that she could not take leave again unless she had the necessary PTO leave available.

72.     During the February 10, 2021 meeting, Benavidez advised both of her supervisors, Madrid and Bayless, verbally and in writing of her need for additional medical leave for her appointments to see her hand specialist to treat her *de Quervain's* tendinopathy, the appointment being on February 26, 2021.

73.     On February 24, 2021, supervisor Bayless and Benavidez had a phone conversation regarding her upcoming leave request for her hand doctor's appointment on February 26, 2021, letting Benavidez know the leave was not approved or excused.

74.     Supervisor Bayless subsequently sent an email on the same day to Benavidez summarizing their phone conversation regarding the upcoming appointment

with her hand specialist, stating: ""The decision is entirely yours to miss work or not. We spoke about the corrective action form presented to you about excessive absences, (516 hours of missed work since July 1,2020), and I reiterated that should you miss ANY work, until you have available PTO, all absences are considered unexcused. Unexcused absences are subject to corrective action, up to and including termination."

75.    The hand doctor's appointment on February 26, 2021 was for a pregnancy-related medical issue that originated during Benavidez's high-risk pregnancy.

76.    Benavidez attended the February 26 doctor's appointment.

77.    Defendants immediately moved to discharge Benavidez on Monday, March 1, 2021 for her unexcused absence on Friday, February 26, 2021.

78.    The overwhelming majority of the 523 hours of missed work since July 1, 2020 (including 7 hours for the February 26 appointment) referenced by supervisor Bayless in Defendants' Notice of Termination of Benavidez's employment were for her pregnancy-related medical issues and maternity leave.

79.    Defendants repeatedly referenced the 516 hours that were originally referenced in the November 2020 written discipline and the final warnings given to her in February 2021, as the reason for her discharge.

80.    Many of these 516 hours referenced by Defendants in the written discipline and warnings given to Benavidez were approved or excused by her supervisors. Benavidez was only being disciplined for a total of 44 hours of missed work pursuant to the written discipline for absences in November 2020 and again in her final

warnings given to her in February 2021.

81.     Defendants' Notice of Termination on March 1, 2023 just added the additional seven (7) hours Benavidez missed on February 26, 2021 to her 516 hours previously accumulated absences.

82.     During Benavidez's employment in 2020 and 2021, Defendants never considered or discussed with Benavidez the options of unpaid leave or other potential reasonable accommodations to avoid discipline and/or termination under their attendance and leave policies.

83.     Upon information and belief, Benavidez was replaced by a non-pregnant employee.

84.     Upon information and belief, Benavidez was replaced by an employee who did not have a disability.

85.     As a result of being fired, Benavidez lost wages, employment benefits and other pecuniary costs related to additional post-employment medical expenses.

## FIRST CLAIM FOR RELIEF
### (Failure to Accommodate Disabilities - 42 U.S.C. §§ 12112(a) and (b)(5)(A))

86.     The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

87.     Benavidez was a qualified individual with a disability who was able, with or without reasonable accommodations, to perform the essential functions of her job.

88.     At all relevant times, Defendants were aware of Benavidez's disabilities.

89.     Benavidez requested reasonable accommodations for her disabilities,

including reasonable periods of leave for her disability-related treatments, medical appointments and conditions without penalty of discipline and discharge.

90.    Defendants did not engage in an interactive process with Benavidez to determine appropriate accommodations for her disabilities.

91.    Defendants failed to provide Benavidez with the reasonable accommodations she requested or any other accommodation. Defendants denied her leave, disciplined and subsequently discharged Charging Party's employment for leave that had already been approved, and denied reasonable accommodations, including consideration of additional unpaid leave.

92.    As described in the foregoing paragraphs, Defendants engaged in unlawful employment practices, in violation of Section 102(b)(5)(A) of the ADA and 42 U.S.C. § 12112(b)(5)(A) by not making reasonable accommodations to the known physical limitations of an otherwise qualified individual with disabilities.

93.    The effect of Defendants' policies and practices complained of in the foregoing paragraphs has been to deprive Benavidez of equal employment opportunities and otherwise adversely affect her status as an employee, because of her disabilities.

94.    Defendants' failure to provide reasonable accommodations for Benavidez was done with reckless indifference to her federally protected rights under the ADA.

95.    Defendants' failure to provide reasonable accommodations for Benavidez caused her harm entitling her to economic, compensatory and punitive damages pursuant to 42 U.S.C. § 1981(a).

**SECOND CLAIM FOR RELIEF**
**(Disparate Treatment Based on Disability or the Need to Provide Accommodation**
**42 U.S.C. §§ 12112(a) and (b)(5) (B))**

96.    The allegations contained in the foregoing paragraphs are hereby
incorporated by reference.

97.    Benavidez was a qualified individual with a disability who was able, with or
without reasonable accommodations, to perform the essential functions of her job
position.

98.    At all relevant times, Defendants were aware of Benavidez's disabilities.

99.    Under the terms and conditions of Defendants' Policy 7.2, Benavidez's
absences should have been reviewed and considered as a reasonable excuse for leave
under the ADA.

100.    Defendants denied her leave, disciplined and subsequently discharged
Benavidez's employment because of her disabilities, and/or because of the need to
provide reasonable accommodation for her disabilities, in violation of Sections 102(a)
and 102(b)(5)(B) of the ADA. 42 U.S.C. §§ 12112(a) and (b)(5)(B).

101.    Defendants discriminated against Benavidez by taking adverse
employment actions against her because of her disabilities, and/or because of the need
to provide reasonable accommodation for their disabilities, in violation of Sections 102(a)
and 102(b)(5)(B) of the ADA.  42 U.S.C. §§ 12112(a) and (b)(5)(B).

102.    Defendants' disparate treatment of Benavidez, pursuant to their inflexible
leave practices under their PTO and other leave policies, adversely affected Benavidez's

ability to take leave for medical treatments, appointments and conditions without penalty of discipline and discharge.

103.    Defendants' discriminatory treatment of Benavidez was done with reckless indifference to her federally protected rights under the ADA.

104.    The effect of Defendants' policies and practices complained of in the foregoing paragraphs has been to deprive Benavidez of equal employment opportunities and otherwise adversely affect her status as an employee, because of her disabilities, in violation of Sections 102(a) and 102(b)(5)(B) of the ADA, 42 U.S.C. §§ 12112(a) and (b)(5)(B).

105.    The unlawful employment practices complained of in the foregoing paragraphs and directed at Benavidez were intentional.

106.    Defendants' unlawful employment practices complained of in the foregoing paragraphs caused harm to Benavidez, because of her disabilities and/or the need to accommodate her disabilities, entitling her to economic, compensatory and punitive damages pursuant to 42 U.S.C. § 1981(a).

### THIRD CLAIM FOR RELIEF
### (Retaliation - 42 U.S.C. §§ 12203)

107.    EEOC reasserts and incorporates by reference all of the foregoing allegations.

108.    Since at least 2020, Defendants engaged in unlawful employment practices, in violation of Section 503 of the ADA, 42 U.S.C. § 12203 by retaliating against Benavidez.

109.     Benavidez engaged in protected conduct under the ADA by requesting reasonable accommodations for disabilities or otherwise opposing what she reasonably believed were unlawful discriminatory employment practices based on the ADA.

110.     Benavidez requested accommodations in the form of leave for medical treatments, appointments, and her conditions and to take emergency medical leave beginning on August 12, 2020.

111.     Benavidez complained to her supervisors about being disciplined for her absences on August 12, 2020, November 17, 2020, December 7, 2020, December 8, 2020, and complained or opposed her supervisors written and verbal threats to terminate her if she missed work for her medical appointment on February 26, 2021.

112.     Defendants retaliated against Benavidez for engaging in protected conduct under the ADA by, among other things, disciplining and subsequently discharging her from her employment, denying her leave, disciplining and discharging her for leave that had already been approved, and/or denying reasonable accommodations, including consideration of unpaid leave.

113.     The effect of the Defendants' practices complained of in the foregoing paragraphs has been to deprive Benavidez of equal employment opportunities by discharging her because she engaged in protected activity.

114.     Defendants' unlawful employment practices complained of in the foregoing paragraphs were intentional.

115.    Defendants' unlawful employment practices complained of in the foregoing paragraphs were done with malice or with reckless indifference to Benavidez's federally protected rights under the ADA.

116.    Defendants' unlawful retaliation caused harm to Benavidez entitling her to economic, compensatory and punitive damages pursuant to 42 U.S.C. § 1981(a).

**FOURTH CLAIM FOR RELIEF**
**[Discrimination on the basis of sex, pregnancy, childbirth, or related medical condition– 42 U.S.C. § 2000e-(3) and 42 U.S.C. § 2000e(k)]**

106.    The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

107 .    Since at least January 2020 to present, Defendant has engaged in unlawful employment practices in violation of the Pregnancy Discrimination Act ("PDA") as incorporated into Section 703(a)(1) of Title VII by discriminating against Benavidez because of her sex and/or pregnancy, childbirth or related medical condition(s).

108.    Defendants' discriminatory acts include counseling, disciplining and discharging Cheyenne R. Benavidez because of her sex, pregnancy, childbirth, or related medical conditions.

109.    Defendants' discriminatory acts include subjecting Cheyenne R. Benavidez to discriminatory terms, conditions, or privileges of employment because of her sex, pregnancy, childbirth or related medical conditions, including but not limited to

denying her requested leave, or penalizing her for taking leave for medical treatments, appointments and conditions, and leave in excess of her accrued PTO leave.

110.  The unlawful employment practices complained of in the foregoing paragraphs were done with malice or reckless indifference to Benavidez's federally protected rights under Title VII.

111.  Defendants unlawful employment practices caused harm to Benavidez, entitling her to economic, compensatory and punitive damages pursuant to 42 U.S.C. § 1981(a).

## JURY TRIAL DEMAND

112.  The Commission requests a jury trial on all questions of fact raised by its complaint.

## PRAYER FOR RELIEF

113.  Wherefore, the Commission respectfully requests that this Court:

    A.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, from engaging in disability discrimination, including denying reasonable accommodations; discriminating in terms, conditions or privileges of employment; discharging employees because of disability(s); or, retaliating against their employees for engaging in protected activity under the ADA.

    B.  Grant a permanent injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or

participation with them, from engaging in discrimination based on sex and/or pregnancy, childbirth, or related medical conditions.

C.    Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities for qualified individuals with disabilities and pregnant women, and which eradicate the effects of their past and present unlawful employment practices.

D.    Order Defendants to make whole Benavidez by providing appropriate back pay and lost benefits with prejudgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to reinstatement, and/or front pay.

E.    Order Defendants to make whole Benavidez by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including job search expenses and medical expenses in amounts to be determined at trial.

F.    Order Defendant to make whole Benavidez by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices described above, including inconvenience, emotional pain, suffering, anxiety, stress, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

G.    Order Defendant to pay Benavidez punitive damages for their malicious and reckless conduct described above, in amounts to be determined at trial.

H.    Grant such further relief as the Court deems necessary and proper.

I.    Award the Commission its costs of this action.

RESPECTFULLY SUBMITTED this 29th day of September 2023.

CHRISTOPHER LAGE
Deputy General Counsel
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
131 M Street NE, 5th Floor
Washington, DC 20507-0004

MARY JO O'NEILL
Regional Attorney
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Phoenix District Office
3300 North Central Avenue, Suite 690
Phoenix, AZ 85012

CHRISTINA VIGIL FRAZIER
Assistant Regional Attorney
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Albuquerque Area Office
500 Gold Ave NW, Suite 6401
Albuquerque, New Mexico 87103

*/s/ Jeff A. Lee*
Jeff A. Lee
Senior Trial Attorney

/s/Lucia Moran
Lucia Moran
Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Albuquerque Area Office
500 Gold Ave NW, Suite 6401

Albuquerque, New Mexico 87103
(505) 738-6723
jeff.lee@eeoc.gov

Attorneys for Plaintiff EEOC

**PLEASE NOTE:**
**For purposes of service upon the EEOC, it is sufficient that pleadings, notices, and court documents be served upon the Trial Attorneys.  Duplicate service is not required on the General Counsel and Associate General Counsel in Washington, D.C.**